IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LISA BOWMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:24-cv-885 (RDA/WEF) |
| | ) |
| UNITED WAY WORLDWIDE, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant United Way Worldwide's ("UWW" or "Defendant") Partial Motion to Dismiss. Dkt. 3. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been briefed and is now ripe for disposition. Considering the Motion together with Defendant's Memorandum in Support, Dkt. 4, Plaintiff Lisa Bowman's ("Plaintiff") Opposition, Dkt. 7, and Defendant's Reply, Dkt. 11, this Court GRANTS the Motion to Dismiss for the reasons that follow.

I. BACKGROUND

A. Factual Background[1]

Plaintiff alleges that Defendant subjected her to a hostile work environment because of her gender and subsequently retaliated against her for complaining of the harassment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Dkt. 1-1 ¶ 1.

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiff, a woman, worked as an Executive Vice President and Chief Marketing and Communications Officer ("CMO") at Defendant from November 2015 to February 2020. *Id.* ¶ 9. She reported to Defendant's President and Chief Executive Officer ("CEO"), Brian Gallagher. *Id.* As part of her role, Plaintiff "led UWW's efforts to create, develop and implement UWW's global marketing strategies." *Id.* ¶ 11.

In October 2017, Gallagher asked Plaintiff to interview William Browning for the new role of Chief Strategy and Transformation Officer, which was a Senior Vice President level position on the Executive Management Team. *Id.* ¶ 15. During the interview, Plaintiff alleges that Browning "stepped very close to" Plaintiff, "inside the boundaries of what would be considered 'personal space,' looked down at her, and" said that she was "really intimidating" and that she had "a reputation for getting sh*t done and taking no sh*t." *Id.* ¶ 16. Plaintiff also states that Browning told her that "they would tangle." *Id.* ¶ 17. When Plaintiff responded that they would resolve disagreements professionally behind closed doors, Browning "responded with 'that would be fun.'" *Id.* Plaintiff later shared with Gallagher that she was reluctant to endorse Browning due to his behavior. *Id.* ¶ 18. Nevertheless, Defendant hired Browning for the role, *id.* ¶ 19, and he began working full time for Defendant at some point in 2018. *Id.* ¶ 23.

Plaintiff alleges that, upon information and belief, during Browning's tenure with Defendant, various female employees filed complaints against him alleging harassment and hostile work environment with Human Resources ("HR"). *Id.* ¶ 22. Plaintiff asserts that Browning's dealings with her specifically were unprofessional and odd. *Id.* ¶ 23. For instance, Browning repeatedly made nasty comments toward Plaintiff, followed by compliments about her appearance, *Id.* ¶¶ 23, 28; routinely addressed Plaintiff as "Bowman," "Boss," or "Boss Lady," instead of by first name or "Ms. Bowman," even though she was his counterpart and not his supervisor, *id.* ¶ 24;

scheduled weekly one-on-one meetings with Plaintiff regarding joint work projects and failed to show up, *id.*; requested that Plaintiff join him for a presentation and announced during the presentation that "I was going to let Lisa present some of this, but she's probably not capable," *id.* ¶ 25; and invited Plaintiff to stay with him at an Airbnb during a work trip, which Plaintiff declined, *id.* ¶ 30. Plaintiff reported many of these incidents and the discomfort she felt to various individuals, including Defendant's Chief of Staff, JG LaChance, *id.* ¶ 26; the HR Director, Thera Carpenter, *id.* ¶ 28; and the Chief Culture Officer, Lori Malcolm, *id.* ¶ 33.

In October 2018, Plaintiff spoke with Malcolm about the issues she had experienced with Browning, *Id.* ¶ 33, and told Malcolm that she planned to meet with Browning in Chicago to address these issues, *Id.* ¶ 34. Malcolm requested that Plaintiff report back on the meeting. *Id.* On October 18, 2018, Plaintiff met with Browning for breakfast and attempted to address the various issues. *Id.* ¶ 35. Browning, however, offered no response to Plaintiff's questions of what could be done to improve their working relationship. *Id.* Plaintiff then had an anxiety attack after leaving the meeting. *Id.* Plaintiff met with Malcolm on October 26, 2018, with the intent of asking for her assistance, however Malcolm spent the meeting soliciting Plaintiff's support for Malcolm to become Defendant's Chief Operations Officer ("COO"). *Id.* ¶ 36. In December 2018, Malcolm was promoted to COO and Plaintiff was promoted from Senior Vice President to Executive Vice President. *Id.* ¶ 37.

In January and February 2019, Browning made more frequent comments about Plaintiff's appearance, stating, for instance, "you look great in your glasses," "your hair is looking really nice today," "I like the way that dress/skirt/outfit fits you," and "that outfit is really flattering on you." *Id.* ¶ 38. Plaintiff began taking precautions to not be alone with Browning, adjusting her work schedule and routes of travel within the office to avoid him unless necessary. *Id.* ¶ 39. Browning,

however, began pacing back and forth outside of Plaintiff's office multiple times each day. *Id.* ¶ 40. Specifically, Plaintiff recounts three separate encounters with Browning in early 2019 during which Browning "blatantly scanned her body up and down multiple times" and complimented her looks, saying, for instance, "You look great today. Really sharp. Nice." *Id.* ¶ 41. Plaintiff inquired whether Carpenter, whose office was close by, had overheard the comments, but she had not. *Id.* Several of Plaintiff's team members, however, commented that the way Browning looked at her made them uncomfortable. *Id.* ¶ 42.

On February 26, 2019, Browning "leered" at Plaintiff and made a comment about how her skirt fit her body in front of two of Plaintiff's subordinates during a conference. *Id.* ¶ 46. Plaintiff had to leave the conference and could not return because "[s]he felt that Mr. Browning had reduced her worth to nothing but her physical appearance" and that "he had demeaned, marginalized and objectified her in front of her colleagues." *Id.* Plaintiff reported this interaction to LaChance, who instructed Plaintiff to bring it to the attention of Amy Dinofrio, Defendant's Vice President of People and Strategies. *Id.* ¶ 47. Plaintiff reported the incident to Dinofrio on February 27, 2019, while in tears. *Id.* ¶ 48. Dinofrio later emailed Plaintiff stating that Browning's behavior was "more than inappropriate. This is not a behavior you or anyone else should experience ever. You should not have any retaliation or issues from him and if you do alert me immediately." *Id.* ¶ 48. Plaintiff alleges that HR took no meaningful action in response to Plaintiff's repeated complaints about Browning's conduct.

Plaintiff asserts that, after complaining to Carpenter, Dinofrio, and Malcom about Browning's treatment of her and other female employees, Defendant began retaliating against her.

4

*Id.* ¶ 50.[2] In March 2019, Gallagher curtailed Plaintiff's access to Defendant's Board of Directors. *Id.* ¶ 42. He also removed resources from Plaintiff's team and reallocated them to Browning. *Id.* ¶ 51. On March 15, 2019, Gallagher informed Plaintiff that he was moving the digital marketing team that reported to her to Browning, even though Browning had no education or experience in marketing, stating that Plaintiff needed to "learn to get along with [Mr. Browning]." *Id.* ¶ 53. Gallagher also instructed Plaintiff to "get rid of" Suzanne Takeuchi, Plaintiff's direct report. *Id.* On April 4, 2019, Galagher gave Plaintiff her 2018 performance review, which included a lower rating than prior reviews. *Id.* ¶ 55. On April 9, 2019, Plaintiff told Malcolm that she felt that she and Takeuchi were being targeted because they had raised concerns about Browning's behavior. *Id.* ¶ 57.

On October 16, 2019, Plaintiff called Browning to try to resolve various work issues, but Browning was passive-aggressive and bullied her by "yelling at her, dismissing her concerns, and insulting her." *Id.* ¶ 63. In October 2019, the working relationships between Plaintiff's team and Browning's team deteriorated, impacting Defendant's work and external clients. *Id.* ¶ 64. Plaintiff again called Malcolm to inform her that she was experiencing significant anxiety and stress from Browning's harassment of her. *Id.* ¶ 65. Malcolm said that she would "investigate" and speak with Browning. *Id.* Plaintiff became aware from her team members that Dinofrio and Malcolm told them that Plaintiff "was causing issues with Mr. Browning and Mr. Gallagher told them to look into this." *Id.* ¶ 66. On November 6, 2019, Plaintiff met with Malcolm and Dinofrio to obtain an update on the investigation of complaints related to Browning. *Id.* ¶¶ 69-70. Malcolm and

---

[2] Plaintiff sets forth a number of additional allegations in support of her Title VII retaliation claim, but the Court only recounts those that are relevant to its analysis for the instant partial Motion to Dismiss Count 1.

Dinofrio told Plaintiff that she "'shared blame' for their problems" but offered no solutions to improve the relationship. *Id.* ¶ 70.

On December 5, 2019, during an Executive Management Team meeting, Gallagher stated that he was considering hiring a Chief Experience Officer to aggregate all customer-facing work. *Id.* ¶ 71. Plaintiff met with Gallagher on December 10, 2019, to express interest in the role. *Id.* ¶ 72. On December 16, 2019, Gallagher informed Plaintiff that he had hired Stan Little for the role and that she would report to him instead. *Id.* ¶ 73. On January 9, 2020, however, Gallagher terminated Plaintiff's employment during a meeting, stating "I don't need you. Stan [Little] will be my top marketing guy now. Get with Lori [Malcolm] and work out the details." *Id.* ¶ 75. Plaintiff asserts that Little did not have a similar background in marketing or communications. *Id.* ¶ 76. Plaintiff agreed with Malcolm that her last day would be February 21, 2020. *Id.* ¶ 78. Defendant, however, abruptly terminated Plaintiff's employment on February 6, 2020. *Id.* ¶ 79.

B.   Procedural Background

Plaintiff filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant, alleging discrimination based on sex and retaliation ("EEOC Charge") on March 17, 2020. *Id.* ¶ 83; Dkt. 4-1 at 5. In March 2024, Plaintiff requested that the EEOC issue a notice of right to sue since more than 180 days had passed since she filed her charge. Dkt. 1-1 ¶ 84. On March 7, 2024, Plaintiff received a Dismissal and Notice of Rights, notifying her of her right to sue Defendant within 90 days. *Id.* ¶ 85. On April 24, 2024, Plaintiff filed suit in the Circuit Court for the City of Alexandria. *Id.* at 4. The case was removed to this Court on May 28, 2024. Dkt. 1. Plaintiff's two-count Complaint alleges gender discrimination and harassment and retaliation in violation of Title VII. Dkt. 1-1 ¶ 1. The first count, gender discrimination and harassment, alleges that Defendant subjected Plaintiff to an unlawful hostile

work environment. *Id.* ¶ 87. The second count, retaliation, alleges that Defendant retaliated against Plaintiff after she complained of the harassment through a series of actions culminating in her termination. *Id.* ¶¶ 96-99.

On June 3, 2024, Defendant filed a Partial Motion to Dismiss Count One of Plaintiff's Complaint. Dkt. 3. Plaintiff filed her Opposition brief on June 17, 2024, Dkt. 7, and Defendant filed its Reply brief on June 24, 2024, Dkt. 11.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). However, "[i]n employment discrimination cases,

courts often take judicial notice of EEOC charges and EEOC decisions." *Prosa v. Austin*, 2022 WL 394465, at *14 (D. Md. Feb. 8, 2022) (quotation omitted).[3]

### III.  ANALYSIS

Defendant moves this Court to dismiss Count I of the Complaint alleging that Defendant subjected Plaintiff to "harassment and a hostile work environment based on her gender," Dkt. 1-1 ¶ 87, because the claim is time-barred, Dkt. 4 at 3-4.  Defendant asserts that "the allegations of sexual harassment fall outside the Title VII statute of limitations," and, as a result, Plaintiff fails to allege facts sufficient to state a claim under Title VII.  *Id.*

Title VII requires a claimant to file an EEOC charge of discrimination within 300 days of the alleged unlawful employment practice if the claimant initially instituted proceedings with a state or local agency.  42 U.S.C. § 2000e-5(e)(1).  "If the statutory time period elapses between the allegedly discriminatory incident and the filing of the EEOC charge, the litigant is forever barred from Title VII relief." *Edwards v. Murphy-Brown, L.L.C.*, 760 F. Supp. 2d 607, 619 (E.D. Va. 2011).  In the hostile work environment context, courts generally follow the "continuing violation doctrine" established by the Supreme Court of the United States in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002), where the Court determined that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory

---

[3] Plaintiff asserts that the instant Motion to Dismiss should be treated as a motion for summary judgment because it relies on Plaintiff's EEOC Charge, which is extrinsic evidence because it is not attached to the Complaint.  Dkt. 7 at 2.  But Plaintiff explicitly references the EEOC Charge in the Complaint, making it "integral to the [C]omplaint" so that the Court can consider it in ruling on the Motion to Dismiss because there is no dispute as to its authenticity. *Tucker v. Sch. Bd. of the City of Va. Beach*, No. 2:13-cv-530, 2014 WL 5529723, at *8 n.4 (E.D. Va. Oct. 31, 2014) ("It is permissible for this Court to consider the EEOC charge because Plaintiff referred to it within her Amended Complaint."); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)) (explaining that a court "may consider documents . . . attached to the motion to dismiss, so long as they are integral to the complaint and authentic" (citations omitted)).

time period, is permissible for the purpose of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." Applying *Morgan*, district judges in this District have made clear that:

> If acts outside the statutory window contribute to a hostile work environment, the Court may consider all of those acts, so long as any act contributing to that same hostile work environment occurs within the statutory window. Such a timely-act "anchors" the previous acts that occurred more than 300 days before the charge, making them also timely under the continuing violation doctrine.

*Edwards*, 760 F. Supp. 2d at 620. Importantly, under the continuing violation doctrine, "incidents can only qualify as a part of the same hostile work environment claim if they are adequately linked—that is, if the incidents involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers." *Mustafa v. Iancu*, 313 F. Supp. 3d 684, 693 (E.D. Va. 2018)

Here, Plaintiff filed her EEOC Charge on March 17, 2020. Dkt. 1-1 ¶ 83; Dkt. 4-1 at 5. Thus, she needed to allege that an anchoring act contributing to her hostile work environment claim occurred on or after May 22, 2019 – 300 days before March 17, 2020. Defendant asserts that the latest Plaintiff alleges that "she was subjected to sexually harassing conduct was on February 26, 2019," which is 85 days prior to May 22, 2019, making Count I untimely. Dkt. 4 at 4 (citing Dkt. 1-1 ¶ 46). In contrast, Plaintiff contends that she alleges that an anchoring act occurred on October 16, 2019, which is after May 22, 2019, and within the 300-day statutory time period. Dkt. 7 at 3-4, 8-9 (citing Dkt. 1-1 ¶ 63). In response, Defendant asserts that Plaintiff's purported anchoring act has no relation to the gender discrimination or hostile work environment claims alleged in Count 1 because the act "has nothing to do with sex (or any other protected characteristics)." Dkt. 11 at 6. Upon review of the Complaint, the Court agrees with Defendant.

To state a hostile work environment claim, Plaintiff must allege sufficient facts to show that the alleged conduct she experienced was: (1) unwelcome; (2) *based on a protected*

9

*characteristic*; (3) sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) imputable to her employer. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495-96 (4th Cir. 2015). To sufficiently plead the second element, a plaintiff must allege "that her protected characteristic under Title VII was the 'but for' cause of the alleged harassment." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022).

Although Plaintiff's Complaint establishes that her gender may have been the but-for cause of some of the alleged incidents, it remains unclear whether it was the but-for cause of Plaintiff's purported anchoring incident. Plaintiff claims that Defendant subjected her to "harassment and a hostile work environment based on her gender" primarily through the acts of her coworker, Browning. Dkt. 1-1 ¶¶ 87-88. Specifically, Plaintiff alleges that Browning (1) addressed her as "Bowman," "Boss," or "Boss Lady" instead of calling her by her first name or "Ms. Bowman"; (2) told meeting participants that "I was going to let Lisa present some of this, but she's probably not capable"; (3) made inappropriate comments about "her hair, her glasses, her clothing, her appearance, and how her body looked in certain clothing"; (4) visually scanned her body and leered at her; (5) intimidated her with his behavior; and (6) invited her to stay with him in an Airbnb during a business trip, which she declined. *Id.* ¶ 88. The section of Plaintiff's Complaint titled "Harassment by Mr. Browning and Ms. Bowman's Complaints," *id.* ¶¶ 22-49, suggests that these incidents occurred between "2018, upon [Browning] starting full-time employment at UWW," *id.* ¶ 23, and "early 2019," *id.* ¶ 41. As Defendant notes, the last incident of gender-based harassment alleged in that section occurred on February 26, 2019, when Browning "visually scanned [Plaintiff]'s body and commented on how great her skirt looked on her body." *Id.* ¶¶ 41(c), 46. After reporting the February 26, 2019 incident, Plaintiff received an email response from Dinofrio, Defendant's Vice President of People and Strategies, stating that "You should not have any

10

retaliation or issues from him and if you do please alert me immediately." *Id.* ¶ 48.

The October 16, 2019 call that Plaintiff asserts is an anchoring event for her hostile work environment claim does not appear in the harassment section of the Complaint, but rather in the subsequent section titled "Retaliation After Ms. Bowman's Complaints." *Id.* ¶¶ 50-70. After the February 26, 2019 incident, Plaintiff does not allege further specific encounters with Browning until eight months later, when Plaintiff herself called Browning "to try to resolve various work issues" on October 16, 2019. *Id.* ¶ 63. During the call, Browning allegedly "became passive-aggressive and started bullying [Plaintiff] by yelling at her, dismissing her concerns, and insulting her." *Id.* The Complaint suggests, however, that actions taken by Defendant's CEO, Gallagher, prior to the call had caused a strain in Plaintiff and Browning's working relationship. For instance, Gallagher allegedly reallocated resources from Plaintiff to Browning, *id.* ¶ 51, and moved the digital marketing team that previously reported to Plaintiff to Browning, *id.* ¶ 53(a).

Given the strain in Plaintiff and Browning's work relationship, that Plaintiff called Browning to resolve work-related issues, and that the call occurred 8 months after the last alleged incident of gender-based harassment, it is unclear whether the October 16, 2019 call is sufficiently linked to the alleged prior incidents of gender-based discrimination to qualify as part of the same hostile work environment claim. *See Mustafa*, 313 F. Supp. 3d at 693 (explaining that "incidents can only qualify as part of the same hostile work environment claim if they are adequately linked— that is, if the incidents involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers"). Although the October 16, 2019 call involved the same coworker as previous incidents, it occurred 8 months after the last alleged incident of gender-based harassment. Further, Plaintiff states that she made the call "to try to resolve various work issues," and the allegations do not demonstrate that Browning's response during the call was driven

11

by her gender, as opposed to those work-related issues.  The general allegation that Browning became "passive-aggressive and started bullying" Plaintiff during the October 16, 2019 call "by yelling at her, dismissing her concerns, and insulting her," Dkt. 1-1 ¶ 63, without further details as to the substance of Browning's communications, leaves the Court with insufficient information to conclude that Browning's response was due to her gender rather than the work issues to which she refers in the Complaint.  For instance, Plaintiff's statement that "[i]n October 2019, working relationships between [Plaintiff]'s team and [ ] Browning's team deteriorated," *Id.* ¶ 64, suggests that the call and Browning's response could have been rooted in broader work-related conflicts, rather than any specific gender-based discrimination.

Plaintiff argues, however, that the allegations describing Browning as acting "in an intimidating, disruptive, obtrusive, passive aggressive, and bullying manner" suggest that his behavior "appears to be motivated by a general hostility toward women." Dkt. 7 at 10.  This Court disagrees.  Absent more specific allegations demonstrating how Browning's conduct during the call exhibited hostility toward Plaintiff's gender, Browning's conduct is more appropriately characterized as "rude treatment," "callous behavior," or a "routine difference of opinion and personality conflict," which the Fourth Circuit has held does not constitute actionable discrimination under Title VII.  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008).

Thus, as presently alleged, the October 16, 2019 call does not provide an anchoring event that can be viewed as part of a continuing pattern of discrimination based on Plaintiff's gender. Dkt. 1-1 ¶ 63.  The continuing violation doctrine therefore does not apply, and Plaintiff's hostile work environment claim is time-barred.  Nevertheless, it may be that Plaintiff is able to plead facts sufficient to demonstrate that the October 16, 2019 call is an anchoring incident by detailing the

substance of Browning's "bullying" and "insult[s]." Dkt. 1-1 ¶ 63. The Court will therefore allow Plaintiff to amend her Complaint and dismiss Count 1 without prejudice.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Partial Motion to Dismiss (Dkt. 3) is GRANTED; and it is

FURTHER ORDERED that Count 1 of the Complaint (Dkt. 1-1) is DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that Plaintiff is DIRECTED to file any amended complaint on or before January 31, 2025, or to notify the Court that she intends to proceed solely on Count 2 by that date.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
January 8, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge

13